## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JEREMY DE LOS SANTOS, et al.,

        Plaintiffs,

v.                                           CV 12-375 WPL/GBW

CITY OF ROSWELL, NEW MEXICO, et al.,

        Defendants.

### MEMORANDUM OPINION AND ORDER

Plaintiffs Jeremy and Joshua De Los Santos allege that Barbara Patterson, the Roswell City Attorney, violated their federal and state constitutional rights as well as the New Mexico Tort Claims Act in connection with Plaintiffs' arrests while street preaching. (Doc. 46 at 6, 8.) Patterson has filed a motion for summary judgment, arguing that she is entitled to summary judgment based on absolute and/or qualified immunity and that she cannot be sued under the New Mexico Tort Claims Act. (Doc. 88 at 1-2, 15.) I grant in part and deny in part Patterson's motion, granting summary judgment as further explained in this Order.

### FACTUAL & PROCEDURAL BACKGROUND

Jeremy De Los Santos and Joshua De Los Santos are brothers and members of the Old Paths Baptist Church. (Doc. 46 at 7.) One or both of the De Los Santos brothers were arrested on six different occasions in 2010 and 2011 in Roswell, New Mexico, after publicly preaching. (*Id.* at 6, 8, 10, 11, 14, 16, 18.) Jeremy De Los Santos was arrested on April 16, 2010, on a sidewalk outside of a nightclub, and charged with disorderly conduct (*Id.* at 9); on September 24, 2010, on the property of Old Paths Baptist Church for disorderly conduct (*Id.* at 10); on November 28,

2010, on the sidewalk outside of the Church on the Move for party to a crime and disturbing lawful assembly (*Id.* at 12); and on August 28, 2011, at the Roswell Police Department ("RPD") for disorderly conduct (*Id.* at 18-20). Joshua De Los Santos was arrested on May 28, 2011, on a sidewalk outside of the Roswell Convention Center for criminal trespass. (*Id.* at 15.) Both Jeremy and Joshua De Los Santos were arrested on July 1, 2011, on Main Street at a public event for the UFO Museum and charged with criminal trespass, obstructing an officer, and wrongful use of property. (*Id.* at 16.) All charges were later dismissed by either a judge or Patterson. (*Id.* at 8-20.)

Plaintiffs have sued the City of Roswell, ten police officers, and Patterson in connection with this case. (*Id.* at 4-6.) With respect to Patterson, Plaintiffs allege that she provided legal advice to the RPD, encouraging the arrest of persons attempting to preach in public areas and in particular, the arrest of such persons for disorderly conduct without probable cause. (*Id.* at 18.) Plaintiffs also allege that Patterson maliciously prosecuted Plaintiffs and that she did not act properly with regard to the return of seized property. (*See* Doc. 88 at 11.)

Patterson has moved for summary judgment on the basis of absolute prosecutorial immunity and/or qualified immunity. (Doc. 88.) She argues that she is entitled to absolute prosecutorial immunity because her conduct was prosecutorial in nature, and, alternatively, that she is entitled to qualified immunity because her conduct did not violate clearly established statutory or constitutional rights. (Doc. 88 at 2, 19; Doc. 143 at 10-20.)  In addition, Patterson claims that she is immune from suit under the New Mexico Tort Claims Act because there is no waiver of immunity in the Act permitting Plaintiffs to sue a prosecutor (Doc. 88 at 15) and because she is not a public employee, but rather an independent contractor (Doc. 143 at 15). Finally, Patterson argues that she is entitled to summary judgment regarding Plaintiffs' claims

involving the violation of property rights because it is undisputed that she had nothing to do with the seizure of property (Doc. 88 at 24; Doc. 143 at 20.)

### STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party bears "the initial burden of showing that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party has met this burden, the nonmoving party must identify specific facts that show the existence of a genuine issue of material fact requiring trial on the merits. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). A fact is "material" if, under the governing law, it could have an effect on the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" if a rational jury could find in favor of the nonmoving party on the evidence presented. *Id.* A mere "scintilla" of evidence is insufficient to successfully oppose a motion for summary judgment. *Id.* at 252. The record and all reasonable inferences therefrom must be viewed in the light most favorable to the nonmovant. *See Muñoz v. St. Mary-Corwin Hosp.*, 221 F.3d 1160, 1164 (10th Cir. 2000).

In a case such as this, where the burden of persuasion at trial would be on the non-movant, the movant can meet Rule 56's burden of production by either (1) providing affirmative evidence negating an essential element of the non-movant's claim or (2) showing the Court that the non-movant's evidence is insufficient to demonstrate an essential element of the non-movant's claim. *Celotex*, 477 U.S. at 331. Evidence provided by either the movant or the non-movant need not be submitted "in a form that would be admissible at trial." *Celetox Corp.*, 477

U.S. at 324. Rather, the content of the evidence presented must be capable of being presented in an admissible form at trial. *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006). For example, parties may submit affidavits to support or oppose a motion for summary judgment even though the affidavits constitute hearsay, provided that the information can be presented in another, admissible form at trial, such as live testimony. *See* FED. R. CIV. P. 56(c)(4); *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1209-10 (10th Cir. 2010); *Treviso*, 455 F.3d at 1160. Affidavits, declarations, and depositions are subject to hearsay restrictions under Rule 56. *Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995). Furthermore, conclusory allegations are not sufficient to avoid summary judgment. *Pasternak v. Lear Petroleum Exploration, Inc.*, 790 F.2d 828, 834 (10th Cir. 1986).

**DISCUSSION**

## I.     Absolute Prosecutorial Immunity

The Supreme Court first addressed absolute immunity in the context of a prosecutor sued pursuant to 42 U.S.C. § 1983 in *Imbler v. Pachtman*. 424 U.S. 409 (1976). The issue presented in *Imbler* was "whether a . . . prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution is amenable to suit under 42 U.S.C. § 1983." *Id.* at 410. In order to determine whether absolute prosecutorial immunity applied in a § 1983 case, the Court first recognized the common-law immunity of a prosecutor. *Id.* at 424. The Court noted the policy considerations upon which common-law prosecutorial immunity was based, explaining that harassment in the form of unfounded lawsuits against prosecutors would divert them from their public duties and perhaps interfere with their independence of judgment. *Id.* at 423. The Court found that prosecutors' duties would be undermined in the same manner in § 1983 cases as in common-law suits for malicious prosecution. *Id.* at 424. The Court therefore held that "in

initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431. Although the Court did not delineate the boundaries of its holding at that time, it agreed with the lower court that the prosecutor's activities were "intimately associated with the judicial phase of the criminal process." *Id.* at 430.

Supreme Court cases subsequent to *Imbler* have served to clarify the boundaries of absolute prosecutorial immunity. In *Burns*, the Court addressed whether a prosecutor was absolutely immune under § 1983 for participating in a probable-cause hearing, for giving legal advice to police officers regarding hypnosis as an investigation technique, and for advising officers that they "probably had probable cause" to arrest the petitioner. *Burns v. Reed*, 500 U.S. 478 (1991). *Burns* placed the burden on the prosecutor to show that absolute immunity was justified. *Id.* at 486. The Court found that the prosecutor's appearance at the probable-cause hearing was protected by absolute immunity, as it safeguarded the judicial process to retain the independence of prosecutors in pre-trial court appearances supporting criminal action. *Id.* at 492. In contrast, the Court found with respect to both sets of legal advice that "advising the police in the investigative phase of a criminal case is [not] so 'intimately associated with the judicial phase of the criminal process.'" *Id.* at 493. The Court explained that because "a suspect or defendant is not likely to be as aware of a prosecutor's role in giving advice as a prosecutor's role in initiating and conducting a prosecution . . . [a]bsolute prosecutorial immunity [is justified] only for actions that are connected with the prosecutor's role in judicial proceedings, not for every litigation-inducing conduct." *Id.* at 494.

The Supreme Court emphasized the difference between advocacy in court and investigatory work for determining whether a prosecutor receives absolute immunity. *Buckley v. Fitzsimmons*, 509 U.S. 258, 273 (1993). The Court explained that "[t]here is a difference

between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* The Court clarified that a prosecutor is not an advocate until he or she has probable cause to have someone arrested. *Id.* at 274. For example, the Court found that neither determining whether a boot print belonged to a suspect nor providing a statement to the media had sufficient ties to the judicial process, and therefore, neither were activities entitling the prosecutor to absolute immunity. *Id.* at 275, 277-78. The former activity was investigatory, while the Court explained that the latter did not initiate prosecution, present a case in court, or prepare for such functions. *Id.* at 278.

The Supreme Court later addressed the nuances of absolute prosecutorial immunity with regard to the preparation and filing of charging documents as well as the execution of certifications for the determination of probable cause in *Kalina v. Fletcher*. 522 U.S. 118 (1997). The Court examined the function involved with each action rather than the position of the person performing it. *Id.* at 127 (citing *Forrester v. White*, 484 U.S. 219, 229 (1988)). It found that the preparation and filing of an information and a motion for an arrest warrant were part of an advocate's function and thus entitled the prosecutor to absolute immunity with respect to these actions. *Id.* at 129.  In contrast, the Court found that while the mere preparation and filing of the certification for the determination of probable cause would have entitled the prosecutor to absolute immunity, her certification of that document placed her in the role of a witness rather than an advocate, precluding absolute immunity. *Id.* at 129-31. The Court noted that "[a]lthough the law required that document to be sworn or certified under penalty of perjury, neither federal

nor state law made it necessary for the prosecutor to make that certification. In doing so, petitioner performed an act that any competent witness might have performed." *Id.* at 129-30.

The Tenth Circuit has also addressed cases involving absolute prosecutorial immunity. In *Nielander*, the court reiterated the types of functions performed by a prosecutor that are entitled to absolute immunity, stating that "[p]rosecutors are entitled to absolute immunity for their decisions to prosecute, their investigatory or evidence gathering actions, their evaluation of evidence, their determination of whether probable cause exists, and their determination of what information to show the court." *Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1164 (10th Cir. 2009) (citing *Imbler*, 424 U.S. at 425-28). The court found that, unlike in *Kalina*, the prosecutor in *Nielander* had not "personally vouched" for the truth of any facts in a complaint/information that he signed and was therefore absolutely immune from suit as to this action. *Id.* at 1164. Similarly, the court found that a prosecutor was absolutely immune for drafting and submitting a petition for a seventy-two-hour psychiatric evaluation when she simply drafted an affidavit including another's allegations without further investigation or attestation as to the truth of the allegations. *Scott v. Hern*, 216 F.3d 897 (10th Cir. 2000). Such conclusions are not confined to the Tenth Circuit; the Fifth Circuit has held that prosecutors are entitled to absolute immunity when they act as advocates in providing legal advice pursuant to facts supplied by police officers to support affidavits for arrest warrants. *Spivey v. Robertson*, 197 F.3d 772, 776 (5th Cir. 1999).

In *Mink*, the Tenth Circuit examined whether absolute immunity attaches when a prosecutor provides legal advice as to the sufficiency of a search warrant application. *Mink v. Suthers*, 482 F.3d 1244 (10th Cir. 2007). The court emphasized that the prosecutor was "far from filing charges" at the time that she reviewed the application and stated that "although the review

of the affidavit can be said to require the exercise of professional judgment, that is true every time a prosecutor provides legal advice. Here, the review of the affidavit squarely falls on the side of investigatory legal advice, and not advocacy before a judicial body." *Id.* at 1262. Finally, while the majority of absolute immunity cases concern an action by a prosecutor, the Tenth Circuit has held that prosecutors who decide not to charge or otherwise prosecute a case are also entitled to absolute immunity. *Dobbert v. Strickland, Jr.*, 670 F.2d 934 (10th Cir. 1982).[1]

 A. <u>Advising Police on Charges To Bring</u>

 Using the "functional" approach adopted by the Supreme Court, I first address whether Patterson is entitled to absolute prosecutorial immunity for advising police officers as to what charges to bring against the De Los Santos brothers.   As discussed below, although Plaintiffs also claim that Patterson authorized certain arrests of Plaintiffs, I find that there is insufficient evidence for a rational jury to find in favor of the Plaintiffs on this issue. Therefore, I focus my absolute prosecutorial immunity analysis on Patterson's advice with regard to charges against the Plaintiffs.

  *1. Incident on July 1, 2011*

 On July 1, 2011, Sergeant Ron Smith directed the arrest of both Plaintiffs on the sidewalk in front of the Roswell UFO Museum and charged them with criminal trespass, obstructing an officer, and wrongful use of public property. (Doc. 140 Ex. 1 at 9.) The sidewalk was included in a permit for an outdoor public festival at the UFO Museum that day. (*See* Doc. 88 at 23.) Plaintiffs' complaint alleges that "RPD Officer Ron Smith contacted Defendant Barbara Ann Patterson. Defendant Patterson advised RPD Officer Ron Smith that the Old Paths Baptist Church members could be arrested and charged with criminal trespass." (Doc. at 16.) Officer

---

[1] Thus, to the extent Plaintiffs claim that Patterson should have prosecuted Edward Faust (Doc. 88 Ex. B at 194-96), Patterson is entitled to absolute immunity.

Smith's police report states that "I contacted Commander Brown and the City Attorney advised me the permit was valid and the Old Paths Baptist Church members could be charged with criminal trespass." (Doc. 140 Ex. 1 at 7.) Officer Smith informed the De Los Santos brothers of the permit and that they would have to move off of festival grounds to preach. (*Id.*) Officer Smith's report indicates that "Commander Brown advised me the City Attorney advised the charges to be filed on the three members of the church group arrested during this contact should be: 1. Criminal trespass; 2. Obstructing, resisting, or evading an officer; 3. Wrongful use of public property." (*Id.* at 8.)

Plaintiffs argue that Patterson cannot claim absolute immunity because she was acting as an investigator, as in *Burns* and *Mink*, rather than as an advocate. (Doc. 140 at 19, 23.) Patterson counters that *Burns* and *Mink* are distinguishable from this case. Patterson argues that she did not advise police regarding proper investigative techniques as in *Burns*, but simply advised the police as to what charges to bring "based on the investigation conducted by the police officers." (Doc. 143 at 10.) Patterson also distinguishes *Mink* in that she did not approve an affidavit in a situation where arrest was not imminent; rather, she acted as a prosecutor in advising what charges to bring. (*Id.* at 11.) Patterson argues that her actions parallel those of the defendant in *Kalina*, where the Court allowed absolute prosecutorial immunity for functions such as "drafting of [a] certification, her determination that the evidence was sufficiently strong to justify a probable-cause finding, *her decision to file charges*, and her presentation of the information and the motion to the court." (Doc. 143 at 11 (quoting *Kalina*, 522 U.S. at 130) (emphasis added).)

The main issue is whether Patterson acted as an advocate in advising police on the charges to bring, or whether she stepped outside of her prosecutorial role. To make this determination, I look in part to the New Mexico State Court Rules to identify the function of

Patterson's actions in the municipal court. New Mexico Rule of Municipal Court Procedure 8-201 states, "[a]n action is commenced by filing with the court: (1) a complaint consisting of a signed statement containing the facts, common name of the offense charged, and where applicable, a specific section number of the municipal ordinance or New Mexico Statutes Annotated, 1978 Compilation, which contains the offense." NMRA, Rule 8-201. Further, with respect to the city attorney, the rules state that "[n]othing in this rule shall be construed to prevent the city attorney of the municipality in which the complaint is filed from dismissing the case or entering an appearance and assuming prosecutorial control over the case." *Id.* 8-111.

I find that Patterson did perform as an advocate when she advised the police in this manner. First, unlike in *Burns*, the investigatory phase leading up to the impending arrests was completed; Patterson simply provided advice that directly enabled the police to complete a criminal complaint and thereby commence an action before the municipal court. Patterson provided prosecutorial advice in a situation where arrest and charges were already imminent, unlike in *Mink*, wherein the prosecutor was "far from filing charges." *Mink*, 482 F.3d at 1262. Under the New Mexico Rules of Municipal Court Procedure, because an action can be commenced by a criminal complaint submitted by a police officer, Patterson did not subsequently need to file charges. *See* NMRA, Rule 8-201. Therefore, I find that in advising the police as to the charges to bring, Patterson directly participated in the commencement of a criminal action, a function that is undoubtedly intimately associated with the judicial process. A prosecutor's "decision to file charges" is protected by absolute immunity. *See Kalina*, 522 U.S. at 130. I find that Patterson is entitled to absolute immunity with respect to her advice as to the charges to bring against the De Los Santos brothers.

I decline to consider Plaintiffs' allegation that Patterson advised Officer Smith that the church members could be arrested, as opposed to merely advising as to the charges, because Plaintiffs have failed to provide evidence such that a rational jury could conclude that Patterson gave this advice to arrest Plaintiffs. (*See* Doc. 46 at 16.) If Patterson advised police to arrest Plaintiffs, this case might align more with *Burns* insofar as Plaintiffs could show that Patterson advised police on whether probable cause existed. *See Burns*, 500 U.S. at 482. However, Plaintiffs have only made conclusory allegations in their complaint regarding the imparting of such advice by Patterson. A party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248-49. Therefore, I find that Patterson's motion for summary judgment cannot be defeated on this basis.

### 2.  *Incident on May 28, 2011*

On May 28, 2011, Roswell Officer Jon Gokey and Sergeant Cruz Zavila arrested Joshua De Los Santos on a sidewalk outside of the Roswell Convention Center during a concert and charged him with criminal trespass. (Doc. 46 at 14-15.) Joshua De Los Santos stated that "Barbara Patterson apparently advised the police that I could be charged with a criminal offense on May 28, 2011." (Doc. 88 Ex. C at 60.) He based this assertion at least in part on a handwritten note found at the bottom of a page of a lease agreement for the Roswell Convention Center. (*See* Doc. 140 at 16; Doc. 88 at 6.)

As discussed, absolute prosecutorial immunity applies to cases in New Mexico where a city attorney advises a police officer on the charges to bring and thereby commences prosecution in municipal court. Thus, if Patterson did indeed advise the police as to the charges to bring in this incident, Patterson would be absolutely immune. Nonetheless, even if Patterson were not

immediately entitled to absolute prosecutorial immunity on this basis, I find that Patterson has demonstrated that the note to which Plaintiffs refer is insufficient evidence to establish that Patterson advised the police on charges to bring. First, the handwritten note regarding the lease of the Convention Center indicates simply: "Per Barbara Patterson when leasing the facility, parking lots included." (Doc. 88 Ex. D; Doc. 88 at 6.) Plaintiffs admit that they have no personal knowledge regarding who wrote the note. (Doc. 88 Ex. A at 266-67.) Furthermore, because the note on the lease indicates that "parking lots" were included but says nothing about the sidewalk, which is where Joshua De Los Santos was arrested (Doc. 46 at 14), the note is irrelevant to support any claim against Patterson for the charges.

Similar to the July 1, 2011, incident, Plaintiffs claim that Patterson authorized Joshua De Los Santos's arrest in addition to advising as to the charges that could be brought. To support Plaintiffs' claim, Plaintiffs refer to four statements by Jeremy De Los Santos. (*See* Doc. 140 at 5-6.) Jeremy De Los Santos stated, "And I—and—I do believe that one of the officers said, you know, we're going to check with Barbara and if everything is okay you all can stay and if it's not, you all are going to have to go or be arrested." (Doc. 140 Ex. 4 at 268.) He stated further that Officer Zavala told the group, "I do what Barbara tells me. If she tells me arrest you, I'm going—going to arrest you." (Doc. 140 Ex. 4 at 269.) Jeremy De Los Santos continued, "He told us that Barbara is the one that calls the shots and he does what she says." (*Id.*) Finally, Plaintiffs claim that on May 10, 2011, Officer Fry told Jeremy De Los Santos that "they've changed how they want to handle you . . . The City Attorney and the D.A. are on board. And are willing to prosecute you." (*Id.* at 5 (quoting *Id.* Ex. 4 at 270-71; *Id.* Ex. 5 at 227-28).) As these four statements in Jeremy De Los Santos's deposition are not admissions by Patterson herself, they constitute hearsay and cannot be used against Patterson in my ruling on her motion for summary

12

judgment. *See Starr*, 54 F.3d at 1555. Furthermore, even if these statements did not constitute hearsay, they do not indicate that Patterson ever actually authorized an arrest.

Finally, Plaintiffs claim that Patterson advised police officers to arrest Plaintiffs on various occasions through a memorandum to the officers. (Doc. 140 at 5, 8, Ex. 7.) This memorandum dealt solely with arrests for disorderly conduct and will be addressed in detail later in this Order.

### 3. *Incident on November 28, 2010*

On November 28, 2010, Jeremy De Los Santos was arrested on the sidewalk outside of the Church on the Move in Roswell and charged with party to a crime and disturbing lawful assembly. (Doc. 46 at 12.) Jeremy De Los Santos testified that he heard an officer on the telephone, likely speaking with Patterson about what charges to bring. (Doc. 88 Ex. A at 260-62.) He stated, "I do believe Ron Smith said this is what Barbara Patterson said we're trying to do. Her name was brought up in there. I do know her name was brought up in it. I can't give an accurate quote as to who said it or how. . . . I don't want to say it was Ron Smith and it was not him, it was one of the other officers." (*Id.*)

Once again, I find that these statements are hearsay, and I therefore cannot consider them in opposition to Patterson's motion for summary judgment. *Starr*, 54 F.3d at 1555. More importantly, I have already found that Patterson is absolutely immune from any advice she gave on what charges to bring.

### B. Advising Police on Grounds for Arrest for Disorderly Conduct—Brackeen Memorandum

Plaintiffs allege that Patterson "wrongfully advised RPD Officers . . . that the arrests of Plaintiffs would be lawful and the RPD officers thereafter did arrest Plaintiffs." (Doc. 46 at 24.) In particular, Plaintiffs claim that Patterson "provided legal advice to the RPD regarding arrests

of persons attempting to exercise protected speech, i.e. to preach in public areas, and specifically with regard to arrest for disorderly conduct in such incidents. This advice appears to authorize arrest for disorderly conduct without probable cause." (*Id.* at 18.) Plaintiffs were arrested for disorderly conduct on three separate occasions: April 16, 2010, September 24, 2010, and August 28, 2011. (*Id.* at 9, 10, 18-19.)

Plaintiffs' Exhibit 7, "the Brackeen Memorandum," is a draft memorandum addressed to "All Officers" of the RPD from Commander Eric Brackeen. (Doc. 140 Ex. 7.) Plaintiffs claim that the Brackeen Memorandum shows that "Patterson counseled RPD officers to arrest Plaintiffs for disorderly conduct when their speech offended listeners as described in a memorandum to all RPD officers from Commander Eric Brackeen." (Doc. 140 at 5.) The relevant passage in the Brackeen Memorandum is as follows:

> I have spoken with City Attorney Barbara Patterson and she advised that if someone, not just Mr. DeLosSantos [sic] and his group, is preaching what is a generalization of Gods [sic] beliefs for example "God hates whores", then this is considered freedom of speech. However, if someone states for example "God hates you whores, or God hates you because you are a whore", then this is a specific verbal attack on a person or group and is NOT a generalization. If this happens in our presence the person can be arrested for Disorderly Conduct. . . . The person or group being called the names does not necessarily have to be offended by the statements. If someone overhears the statements and is offended, the person(s) should be listed on the report as victim or witness, and the appropriate action taken.

(Doc. 140 Ex. 7.)

 Patterson denies that she counseled RPD officers to arrest Plaintiffs for offensive speech. She states that "[t]he memo is marked draft and is undated, and there is no evidence it was ever distributed." (Doc. 143 at 9.) Further, she claims that there is no evidence that it "was utilized in any arrest of Jeremy De Los Santos." (*Id.* at 5.) On these bases, she argues that the Brackeen

Memorandum is not admissible evidence, nor material to her motion for summary judgment. (*Id.* at 5.)

I find that the Brackeen Memorandum is material to Patterson's motion for summary judgment because the timing and nature of the advice included in the memorandum affect the disposition of this case in a manner different from the advice she provided on charging decisions. In addition, the memorandum is admissible evidence for the purpose of this summary judgment motion. Patterson does not elaborate on why she believes that the memorandum is inadmissible. If she is attempting to challenge the authenticity of the document, the Brackeen Memorandum is authentic per se, as "documents produced during discovery that are on the letterhead of the opposing, producing party are authentic per se for purposes of Federal Rules of Evidence 901." *Law Co., Inc. v. Mohawk Constr. & Supply Co., Inc.*, 577 F.3d 1164, 1170 (10th Cir. 2009) (addressing documents considered at the summary judgment stage). Although the Brackeen Memorandum is not written on Patterson's own letterhead, the fact that it is written on RPD letterhead is sufficient to establish authenticity. In *Denison*, which involved an appeal of the district court's denial of a motion for judgment notwithstanding the verdict, the court found that a document printed on the letterhead of a former co-defendant was still self-authenticated as to the remaining defendant against whom the evidence was offered. *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1423 (10th Cir. 1991). As the City of Roswell and many RPD officers are Patterson's co-defendants, the document was found during discovery, and it is printed on RPD letterhead, I will consider the memorandum with respect to Patterson's motion for summary judgment.

The memorandum includes statements regarding Patterson's advice with respect to arresting people for disorderly conduct. (Doc. 140 Ex. 7.) Unlike the advice she provided to

police about specific charges to file in association with contemporaneous arrests, the advice in the Brackeen Memorandum is not associated with an imminent arrest—it is not intimately associated with the judicial process. Nor is the advice inadmissible as hearsay; rather, the advice is admissible as an opposing party's statement pursuant to Federal Rule of Evidence 801(d)(2). When a prosecutor is not performing a function intimately associated with the judicial process, he or she is not entitled to absolute prosecutorial immunity. Therefore, I find that Patterson is not entitled to absolute prosecutorial immunity with respect to advice outlined in the Brackeen Memorandum.

C.  Malicious Prosecution/Malicious Abuse of Process

Plaintiffs allege in their complaint that the arrests and prosecution of Plaintiffs on July 1, 2011, amounted to malicious prosecution by Patterson under the Fourth and Fourteenth Amendments to the United States Constitution. (Doc. 46 at 21.) In order to establish a malicious prosecution claim under § 1983, the plaintiff must show that the defendant commenced or continued a proceeding against him or her without probable cause. *Nielander*, 582 F.3d at 1164 (10th Cir. 2009) (citing *Becker v. Kroll*, 494 F.3d 904, 913-14 (10th Cir. 2007)). Furthermore, the plaintiff must show that he was seized. *Id.* at 1165 (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality)).

Plaintiffs also allege that the prosecution of Jeremy De Los Santos for conduct occurring on August 26, 2011, amounted to malicious abuse of process under the Fourth and Fourteenth Amendments to the United States Constitution and the New Mexico Tort Claims Act. (Doc. 46 at 21, 23.) As one piece of evidence to support their claims for malicious prosecution and malicious abuse of process, Plaintiffs allege that Patterson dismissed charges before trial with regard to the

incidents occurring on September 24, 2010, November 28, 2010, May 28, 2011, July 1, 2011, and August 26, 2011. (*Id.* 10, 12, 13, 16, 20.)

The term "malicious abuse of process" combines the formerly separate terms "malicious prosecution" and "abuse of process." *See DeVaney v. Thriftway Mktg. Corp.*, 953 P.2d 277 (N.M. 1997), *overruled on other grounds by Durham v. Guest*, 204 P.3d 19 (N.M. 2009). In New Mexico, the elements currently required for malicious abuse of process are as follows: "(1) the use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) a primary motive in the use of process to accomplish an illegitimate end; and (3) damages." *Durham*, 204 P.3d at 26. An improper use of process can occur through: "(1) filing a complaint without probable cause, or (2) 'an irregularity or impropriety suggesting extortion, delay, or harassment[,]' or other conduct formerly actionable under the tort of abuse of process." *Fleetwood Retail Corp. of N.M.*, 164 P.3d 31, 35 (N.M. 2007) (citation omitted).

### 1. *Incident on July 1, 2011*

Patterson is absolutely immune from suit under § 1983 for Plaintiffs' claim for malicious prosecution. The Supreme Court has stated that "in initiating a prosecution and in presenting the . . . case, the prosecutor is immune from a civil suit for damages under § 1983." *Imbler*, 424 U.S. at 431. The Court discussed absolute prosecutorial immunity in the context of malicious-prosecution tort claims at common law and concluded that malicious-prosecution claims under § 1983 undermine the prosecutor's performance of his duties just as much as a malicious-prosecution tort claim. *Id.* at 422. Absolute prosecutorial immunity applies even where the prosecutor knowingly presented perjured testimony, purposely withheld exculpatory evidence, or failed to fully disclose material facts that would cast doubt on the prosecution. *See id.* at 416. The

Supreme Court has outlined an exception to absolute prosecutorial immunity where the prosecutor personally vouches for facts in documents such as a certification and is therefore acting in the role of a witness. *See Kalina*, 522 U.S. at 125-29. I find no indication in this case that Patterson acted as a witness in initiating or continuing proceedings against Plaintiffs. Therefore, I find that Patterson is entitled to absolute prosecutorial immunity with respect to Plaintiffs' claim of malicious prosecution.

### 2. Incident on August 26, 2011

Plaintiffs allege malicious abuse of process under two legal theories with respect to the August 26, 2011, incident. First, they claim a violation of the Fourth and Fourteenth Amendments to the United States Constitution, stating that "[t]he prosecution of Plaintiff Jeremy De Los Santos for conduct that allegedly occurred on August 26, 2011, amounted to malicious abuse of process." (Doc. 46 at 21.) Second, they allege a violation of the New Mexico Tort Claims Act for malicious abuse of process during the same incident. (*Id.* at 20, 24.)

#### a. Fourth and Fourteenth Amendments

The Tenth Circuit recognizes § 1983 claims founded on malicious prosecution. *See, e.g.*, *Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996); *Wolford v. Lasater*, 78 F.3d 484 (10th Cir. 1996). Although malicious prosecution has been subsumed by malicious abuse of process in New Mexico, I analyze the concept of malicious abuse of process under Tenth Circuit precedent for malicious prosecution because the Tenth Circuit itself has not merged the terms. The Tenth Circuit analyzes malicious prosecution claims under § 1983 by using the common-law elements of malicious prosecution as a starting point and then determining whether the plaintiff has demonstrated a violation of the Fourth Amendment's right to be free from unreasonable seizures. *Taylor*, 82 F.3d at 1561.

I have already found that Patterson is entitled to absolute prosecutorial immunity in terms of any advice she gave police officers regarding the charges to bring against Plaintiffs. Further, I have found that there is insufficient evidence for a rational jury to find that Defendant Patterson directly advised the police to arrest Plaintiffs. Therefore, Defendant Patterson is absolutely immune from suit under § 1983 with respect to any charging advice or directions to arrest the Plaintiffs as these actions relate to unreasonable seizures under the Fourth Amendment.

b.   New Mexico Tort Claims Act

The New Mexico Tort Claims Act provides exceptions to state sovereign immunity. The act states: "The legislature recognizes the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity. . . . [I]t is declared to be the public policy of New Mexico that governmental entities and public employees shall only be liable within the limitations of the Tort Claims Act." N.M. STAT. ANN. § 41-4-2(A) (2013). Plaintiffs concede that government entities and public employees are immune from tort liability unless the combination of their position and the pertinent action serve to waive immunity. (*See* Doc. 140 at 35.) However, Plaintiffs claim that they have alleged violations of the New Mexico Religious Freedom Restoration Act, the violation of which waives immunity under § 41-4-4 of the Tort Claims Act. (Doc. 140 at 35; N.M. STAT. ANN. §§ 41-4-4, 28-22-4.) Despite this claim, Plaintiffs did not in fact allege a violation of the New Mexico Religious Freedom Restoration Act in their second amended complaint. (Doc. 46.) Under FED. R. CIV. P. 8(a)(2), pleaders are required to give opponents fair notice of their claims and the grounds for such claims. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007). Because Plaintiffs failed to provide Patterson with fair notice that she would have to defend against a New Mexico Religious

Freedom Restoration Act claim, I will not consider any implications that the Religious Freedom Restoration Act might have had in this case.

Instead, I address only whether Patterson is immune from liability under the Tort Claims Act. First, I note that the Tort Claims Act applies solely to "government entities and public employees." N.M. STAT. ANN. § 41-4-2. The Tort Claims Act excludes independent contractors from its definition of a "public employee." N.M. STAT. ANN. § 41-4-3(F). Plaintiffs claim that Patterson is a public employee, while Patterson claims to be an independent contractor. (Doc. 140 at 36; Doc. 143 at 15.)

In a case involving the determination of whether a person is an employee, a defendant is "only required to make a prima facie showing that [she is] entitled to summary judgment, and if [she does] so, the burden [is] then on plaintiff to show at least a reasonable doubt as to whether genuine issues of fact existed." *Monett v. Dona Ana Cnty. Sheriff's Posse*, 840 P.2d 599, 603 (N.M. Ct. App. 1992) (citing *Trujillo v. Treat*, 752 P.2d 250, 251 (N.M. Ct. App. 1988)). Patterson has made a prima facie showing that she is an independent contractor by providing a copy of her Contract for Legal Services, which explicitly states that she is an independent contractor. (Doc. 143 Ex. G at 4.) The burden then shifts to Plaintiffs to raise a reasonable doubt as to whether she is actually an employee. *Monett*, 840 P.2d at 603. Plaintiffs have failed to raise such reasonable doubt. Instead, Plaintiffs merely state that "[h]ow an employment contract defines the status of an individual, while relevant and material, does not answer whether an individual is a public employee or an independent contractor." *Blea v. Fields*, 120 P.3d 430, 436 (N.M. 2005). Plaintiffs claim that Patterson has failed to address other considerations adopted by the New Mexico Supreme Court for determining whether a person is acting as an employee or an

independent contractor.[2] (Doc. 146 at 3-4.) Yet the burden had shifted to Plaintiffs to avoid summary judgment by introducing reasonable doubt that Patterson was actually an employee. Due to Plaintiffs' failure to introduce reasonable doubt to rebut Patterson's prima facie case, I find that Patterson is an independent contractor, and the Tort Claims Act is therefore not applicable to her.

Whether Patterson is actually an independent contractor or an employee does not impact her immunity. If Patterson were considered a public employee, she would still be immune from suit under the Tort Claims Act. Prosecutors are not among those for whom immunity is waived under the Tort Claims Act. *Coyazo v. State*, 897 P.2d 234, 238 (N.M. Ct. App. 1995) (holding that prosecutors do not fall under the law enforcement officer liability provision § 41-4-12); *see* N.M. STAT. ANN. § 41-4-5 –41-4-12.

## II.     Qualified Immunity

Patterson claims that "[s]hould the Court determine that any of the claims against [her] do not fall within absolute prosecutorial immunity, she is still entitled to assert qualified immunity." (Doc. 88 at 16.) Because I have found that Patterson is not entitled to absolute prosecutorial immunity for the advice contained in the Brackeen Memorandum, I must address this issue.

The purpose of qualified immunity is to shield government officials from suit so that "bare allegations of malice [do] not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18

---

[2] These considerations include the following: "(1) the extent of control over the agent's work; (2) whether the employed individual has a distinct business; (3) the type of occupation and extent of usual supervision; (4) the skill the occupation requires; (5) who provides the materials and location to conduct the work; (6) the length of time the individual is employed; (7) the method of payment; (8) whether the work is part of the employer's regular business; (9) whether the parties believe they are creating an employment relationship; and (10) whether the principal is a business." *Celaya v. Hall*, 85 P.3d 239, 243 (N.M. 2004).

(1982). Qualified immunity is broad and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). When a defendant moves for summary judgment on the basis of qualified immunity, it is the plaintiff's burden to show that: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Furthermore, "[i]f, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he . . . is entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

Patterson agreed to withdraw, without prejudice, her argument that there is a lack of causal evidence of a constitutional violation. (Doc. 143 at 1.) Therefore, at this point, I only analyze the second prong of the qualified immunity test—whether the constitutional right was clearly established. With respect to this prong, a right is "clearly established" if the right is "sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right."[3] *Tonkovich v. Kansas Bd. of Regents*, 159 F.3d 504, 516-17 (10th Cir. 1998) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). The official need not directly participate in the violation of rights in order to be liable under § 1983. *Buck v. City of Albuquerque*, 549 F.3d 1269, 1279 (10th Cir. 2008). Rather, any official who "set in motion" events that cause a violation of one's constitutional rights and knew or should have known that his or her actions would cause such deprivation can be held liable. *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (citing *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir. 1988), *cert. denied*, 488 U.S. 856 (1988)).

---

[3] Qualified immunity even applies to law enforcement officials who "reasonably but mistakenly conclude that probable cause is present." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

Because the Brackeen Memorandum deals with arrests for disorderly conduct, I must determine whether Plaintiffs have shown that the rights under the First Amendment with respect to disorderly conduct are clearly established. In the Tenth Circuit, a right is clearly established if there is "a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts" indicates that such a right is clearly established. *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). The State of New Mexico defines "disorderly conduct" as "engaging in violent, abusive, indecent, profane, boisterous, unreasonably loud or otherwise disorderly conduct which tends to disturb the peace." *Fogarty v. Gallegos*, 523 F.3d 1147, 1156 (10th Cir. 2008) (quoting N.M. STAT. ANN. § 30-20-1(A)). The court stated that New Mexico cases defining the scope of "disorderly conduct" are "unambiguous." *Id.* at 1159. New Mexico has a two-part test to determine whether conduct falls under this definition of disorderly conduct. First, the conduct must qualify as one of the categories listed in the statute. *Id.* at 1156. Second, the potential effect on others must be such that it "tend[s] to disturb the peace." *Id.* (quoting *State v. Oden*, 484 P.2d 1273, 1274 (N.M. Ct. App. 1971)). Disturbing the peace necessitates "an act of violence, or . . . an act likely to produce violence, or which, by causing consternation and alarm, disturbs the peace and quiet of the community." *Id*. (quoting *State v. Florstedt*, 419 P.2d 248, 249 (N.M. 1966)).

Plaintiffs cite to *State v. James M.*, 806 P.2d 1063, 1068 (N.M. Ct. App. 1990), to support their argument that disorderly conduct in the form of speech must comprise fighting words.[4] (Doc. 140 at 28.) In the Tenth Circuit, "fighting words" are defined as "epithets (1) directed at the person of the hearer, (2) inherently likely to cause a violent reaction, and (3) playing no role in the expression of ideas." *Cannon v. City & Cnty. of Denver*, 998 F.2d 867, 873 (10th Cir.

---

[4] "By narrowly construing the statute to punish only 'fighting words,' we avoid any punishment of speech that is protected under the first and fourteenth amendments." *Id.*

1993). Plaintiffs cite to several Tenth Circuit cases to show that First Amendment rights in the context of disorderly conduct are clearly established. (Doc. 140 at 29.) In *York*, the court cites to *Cannon*, reaffirming the test for fighting words. *York v. City of Las Cruces*, 523 F.3d 1205, 1212 (10th Cir. 2008). The plaintiff in *York* had been arrested for disorderly conduct for loudly saying the word "bitch" in a parking lot. *Id.* The court proceeded through the three-part test for fighting words as follows:

> First, there is no evidence that Mr. York's comment was directed to anyone in particular, instead, he was in his vehicle when he made the remark and several parking spaces away from the space taken by the female driver [who may have been the target of the exclamation]. Second, he did not threaten or offer a fight. Last, there is no evidence that any reasonable person would react violently to hearing this word.

*Id.* Here, the court emphasized the importance of each prong of the test; without all three prongs, a person cannot rightfully be arrested for disorderly conduct.

With respect to the second prong of the test, courts have held that only where "the speaker passes the bounds of argument or persuasion and undertakes incitement to riot" may police arrest someone for disturbing the peace. *Cannon*, 998 F.2d at 873 (quoting *Feiner v. New York*, 340 U.S. 315, 321 (1951)). Phrased differently, "[t]o be punishable, words must do more than bother the listener; they must be nothing less than 'an invitation to exchange fisticuffs.'" *Stone v. Juarez*, No. 05-CV-508, 2006 WL 1305039, at *8 (D.N.M. Apr. 23, 2006) (unpublished) (quoting *Johnson v. Campbell*, 332 F.3d 199, 212 (3d Cir. 2003)).[5] The Tenth Circuit asks whether an "average person" would be provoked to retaliate and cause a breach of the peace to

---

[5] In *Stone*, the plaintiff had yelled "fuck you" to a police officer in a crowded mall. *Stone*, 2006 WL 1305039. The court found that plaintiff's arrest violated his First Amendment rights, explaining that "'Fuck you' in this situation is protected speech directed at a police officer regardless whether a crowd of people heard it. '[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.'" *Id.* (quoting *Houston v. Hill*, 482 U.S. 451, 461 (1987)).

determine whether a plaintiff's actions fulfilled the second prong of the fighting-words test. *United States v. McKinney*, 9 F. App'x 887, 888 (10th Cir. 2001) (unpublished) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 574 (1942)).[6]

The Brackeen Memorandum advises in part that if someone preaches, for example, "'God hates whores', then this is considered freedom of speech. However, if someone states for example 'God hates you whores, or God hates you because you are a whore,' then this is a specific verbal attack on a person or group and is NOT a generalization.'" (Doc. 140 Ex. 7.) I find that these sentences satisfy the first prong of the fighting-words test because the advice suggests that words directed at the person of the hearer may qualify as disorderly conduct. However, there is nothing in the Brackeen Memorandum that references the other two prongs of the test—that the words are inherently likely to cause a violent reaction and play no role in the expression of ideas. The advice simply points to words directed at a person and states that "[i]f this happens in our presence the person can be arrested for Disorderly Conduct." (*Id.*) Furthermore, the advice runs contrary to the requirement that the words be likely to cause a violent reaction. The memorandum states that "[t]he person or group being called the names does not necessarily have to be offended by the statements. If someone overhears the statements and is offended, the person(s) should be listed on the report as victim or witness, and the appropriate action taken." (*Id.*) The proper test is whether the average person would be provoked to retaliate—likely requiring that the person be offended. Offense in itself is not sufficient to satisfy the second prong of the fighting-words test.

---

[6] In *McKinney*, the plaintiff had told a military police officer to "go f*** himself." *McKinney*, 9 F. App'x at 888. The Court found that "[t]hough tasteless and undoubtedly offensive to many, Ms. McKinney's language would not provoke the average person to retaliate under the circumstances." *Id.* at 889.

I find unpersuasive Patterson's argument that Plaintiffs have failed to show that the law regarding the First Amendment and disorderly conduct is clearly established. Patterson cites several cases from outside of the Tenth Circuit that do not mention the full, three-part fighting-words test to which the Tenth Circuit adheres. Further, the cases can be distinguished from this case. In *Gilles*, "Gilles placed his listeners in categories defined by sexual activity, sexual orientation, and sexually transmitted disease. This language was inherently likely to provoke a violent reaction." *Gilles v. State*, 531 N.E.2d 220, 223 (Ind. Ct. App. 1988). In *Mikhail*, a police officer determined that a street preacher was about to be attacked and told the preacher to stop preaching. *Mikhail v. City of Lake Worth*, No. 08-CV-81008, 2009 WL 1873650 (S.D. Fla. June 30, 2009) (unpublished). The Brackeen Memorandum includes nothing about language that is likely to provoke a violent reaction; the closest it reaches is a discussion on taking offense, and it states that even taking offense is not required for an arrest for disorderly conduct. (Doc. 140 Ex. 7.) Patterson also cites *Broadstone*[7] and *Bethel*,[8] both of which also involved situations likely to disintegrate into violence.

Therefore, I find that Plaintiffs have shown that their rights with regard to a disorderly conduct arrest are clearly established in the Tenth Circuit, and Patterson is not entitled to qualified immunity at this time with respect to any advice she may have provided in the Brackeen Memorandum.

## III.   Violation of Property Rights

---

[7] In *Broadstone*, plaintiff yelled profanities near a school, targeting particular people. *State v. Broadstone*, 447 N.W.2d 30 (Neb. 1989).

[8] In *Bethel*, plaintiff repeatedly yelled at a thirteen-year-old girl for sitting on her boyfriend's lap at a Mardi Gras parade, stating that she would "burn in hell" and that she would kill her babies for sitting on her boyfriend's lap. *Bethel v. City of Mobile*, No. 10-CV-0009, 2011 WL 1298130, at *3 (S.D. Ala. Apr. 5, 2011) (unpublished).

Plaintiffs' complaint alleges that "[v]arious RPD officers wrongfully seized property belonging to Plaintiffs and have not returned such property despite repeated requests for the return of the property." (Doc. 46 at 7.) Plaintiffs claim that RPD officers confiscated a megaphone and digital camera from Jeremy De Los Santos on September 24, 2010, as well as a video camera from Joshua De Los Santos on July 1, 2011, and have not returned these items. (*Id.* at 7, 10, 11, 16.) Patterson states in her motion that because RPD officers seized the property and there is no indication that she played any role in this seizure, she is entitled to summary judgment on the matter. (Doc. 88 at 14.) Specifically, Patterson states that "[n]either the City, RPD, nor its officers have alleged advice of counsel as a defense relating to their seizure or retention of the evidence." (Doc. 88 at 14.) Plaintiffs do not dispute this contention. (Doc 140, Doc. 146.) Because Plaintiffs have not contested that Patterson had no connection to the seizure of property, I find that there is no genuine dispute as to any material fact related to Plaintiffs' property allegations, and Patterson is entitled to summary judgment on this issue.

### CONCLUSION

In sum, I find that Patterson is absolutely immune from suit as to all § 1983 claims arising from the arrests or prosecutions of Plaintiffs except as relating to the Brackeen Memorandum. Patterson is also immune from suit under the New Mexico Tort Claims Act. Furthermore, she is entitled to summary judgment with regard to Plaintiffs' claims alleging violations of their property rights. However, with respect to the Brackeen Memorandum, Patterson is entitled to neither absolute nor qualified immunity at this time.

Patterson's Motion for Summary Judgment is therefore GRANTED with respect to all claims except as they relate to the Brackeen Memorandum and DENIED as to that memorandum.

**IT IS SO ORDERED.**

_____
William P. Lynch
United States Magistrate Judge